UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MIDCONTINENT COMMUNICATIONS, <br><br> Plaintiff, <br><br> vs. <br><br> MCI COMMUNICATIONS SERVICES, INC., d/b/a VERIZON BUSINESS, <br><br> Defendant. | 4:16-CV-04070-KES <br><br><br> ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff, Midcontinent Communications (Midco), initiated this action naming MCI Communications Services, Inc., d/b/a Verizon Business (Verizon) as the defendant. Midco alleges that Verizon breached its contract and that Midco is entitled to a declaratory judgment under SDCL § 21-24-2. Docket 40. Verizon filed counterclaims for breach of contract and declaratory judgment against Midco. Docket 41. Both parties move for summary judgment on all claims and counterclaims.

**FACTUAL BACKGROUND**

The undisputed facts are:

Midco is a cable company that provides local telephone service to residential and business customers and is classified as a local exchange carrier (LEC). Docket 46 ¶¶ 1, 3. Midco operates in South Dakota, North Dakota, Minnesota, and Kansas, but only its operations in South Dakota, North Dakota, and Minnesota are relevant to this dispute. *Id.* Midco operates under

certificates granted by the South Dakota Public Utilities Commission, North Dakota Public Utilities Commission, and Minnesota Public Utilities Commission. *Id.* ¶ 2. An LEC's network connects directly to the LEC's end-user customers – the people who answer or dial the phone. *Id.* ¶ 3. When an LEC's end-user customer receives a phone call, the call travels across the LEC's local network and is delivered directly from the LEC's network customer. *Id.* When an LEC's end-user customer places a telephone call, the call is delivered directly from the customer to the LEC's local network. *Id.* ¶ 3.

There are two types of LECs. In general, the LECs that existed before the effective date of the Telecommunications Act of 1996 (February 8, 1996) are known as incumbent LECs (ILECs). *See* 47 U.S.C. § 251(h)(1). LECs that entered the marketplace after the 1996 Act took effect and compete with ILECs and each other are known as competitive LECs (CLECs). *See* 47 C.F.R. § 61.26(a)(1). Midco is classified as a CLEC. Docket 46 ¶ 5. A carrier that offers long-distance telephone service to end-user customers and transmits long-distance calls between the networks of two LECs is known as an "interexchange carrier" or "IXC." *Id.* ¶ 6.  As an LEC, Midco provides switched access service when it permits an IXC, like Verizon, to access its network to terminate and originate long-distance calls to and from the LEC's end-user customers. *Id.* ¶ 7. Thus, Midco allows Verizon to access Midco's local exchange network to originate or terminate long-distance telephone calls involving Midco's end-user customers. *Id.* ¶ 8. Verizon is classified as an IXC operating throughout the United States. *Id.* ¶ 9. Since 2006, Verizon has

delivered long distance calls to, and received them from, Midco's network. *Id.* ¶ 10. On those calls, Midco charges Verizon for switched access service. *Id.*

Since 2006, Midco has operated a single switch located in Sioux Falls, South Dakota (Sioux Falls Switch). *Id.* ¶ 11. All of the long-distance calls that Verizon has exchanged with Midco have travelled through the Sioux Falls Switch on their way to or from Midco's end-user customers in South Dakota, Minnesota, and North Dakota. *Id.* The only way that Verizon's long-distance traffic can reach Midco's local customers or for Midco's local customer traffic to reach Verizon's long-distance network, is for the traffic to travel through the Sioux Falls Switch. *Id.*

Midco also operates equipment called "gateways." *Id.* ¶ 12. Gateways are spread throughout Midco's three-state footprint and permit other carriers to connect and deliver calls to Midco's network. *Id.* Their function is to receive calls from other carriers and carry them to the Sioux Falls Switch. *Id.* All of Midco's gateways are connected to the Sioux Falls Switch. *Id.* The Sioux Falls Switch then decides where to route the calls, also referred to as "switching," and sends the calls out over Midco's network to the appropriate Midco end-user customer for termination. *Id.*

IXCs can establish calls with Midco's network in one of two ways. First, IXCs can establish a "direct trunk" that connects their network directly to Midco's network by either connecting with the Sioux Falls Switch itself or into a Midco-owned gateway that is connected to the Sioux Falls Switch. *Id.* ¶ 13. This allows long-distance carriers to send calls directly to, or receive calls

3

directly from, the Sioux Falls Switch. *Id.* Second, long-distance carriers can send calls to Midco's network via another LEC's tandem switch. *Id.* A tandem switch is a switch that routes calls between other switches. *Id.* A tandem switch is sometimes called a class 4 switch. *Id.* In contrast, an end-office switch routes calls directly to and from end users. *Id.* An end-office switch is sometimes called a class 5 switch. *Id.* Switches that are capable of performing both as a tandem switch and as an end-office switch are commonly referred to as class 4/5 switches. *Id.* The Sioux Falls Switch is a class 4/5 switch, so it has the physical capability of performing both tandem and end-office switching functions. *Id.* ¶ 14.

The Local Exchange Routing Guide (LERG) is an industry-standard database that LECs and IXCs use to route long-distance and local calls. *Id.* ¶ 15. Carriers are responsible for populating the LERG with information about their own switches and other equipment. *Id.* Both Midco and Verizon rely on the LERG to make call-routing decisions and to make assessments of other carriers' equipment. *Id.* Midco maintains that there are no requirements or standards as to how or with what information a carrier must populate the LERG. *Id.*

Since 2011, Midco has registered the Sioux Falls Switch as an end-office switch in the LERG. *Id.* ¶ 16. According to the LERG, Midco's Sioux Falls Switch subtends a tandem switch that is owned by CenturyLink and is located in Sioux Falls, South Dakota. *Id.* Thus, calls sent to the CenturyLink Tandem can be routed to the Sioux Falls Switch for termination, and calls originating

from the Sioux Falls Switch can be routed to the CenturyLink Tandem. *Id.* The LERG describes the CenturyLink Tandem as the tandem switch associated with the Sioux Falls Switch. *Id.* The LERG also associates the Sioux Falls Switch with Midco's various gateways. *Id.* ¶ 17. Since 2011, Midco has not registered any end-office switch that subtends the Sioux Falls Switch. *Id.* Midco maintains that it is not required to do so. *Id.*

Embedded Multimedia Terminal Adaptors (EMTAs) are boxes that reside inside the premises of Midco's end-user customers. *Id.* ¶ 18. EMTAs convert incoming voice signals traveling across Midco's network into analog form capable of being interpreted by a customer's traditional telephone. *Id.* Midco does not offer long-distance companies the ability to connect directly into its end-users' EMTAs. *Id.* An EMTA is not capable of routing in-bound calls to any destination other than the particular telephones within the premises to which it is connected, and it is not capable of routing out-bound calls to a destination other than Midco's Sioux Falls Switch. *Id.* Similar to other LECs, Midco does not register its EMTAs in the LERG. *Id.* Midco contends that its EMTAs functioned as end-office switches on long-distance calls exchanged with Verizon's network. *Id.* ¶ 19.

Before 2007, Verizon exchanged long-distance calls with Midco's network by sending them to and receiving them from the CenturyLink Tandem. *Id.* ¶ 20. Since 2007, Midco has billed Verizon for switched access service under its tariffs filed with the Federal Communication Commission (FCC) and relevant state Public Utility Commissions (PUCs). *Id.* ¶ 21. Midco's provision of switched

access service on interstate long-distance calls was governed by Midco's FCC Tariff No. 1, and Midco's provision of switched access service on intrastate long-distance calls was governed by the tariff filed with the corresponding state PUC. *Id.*

In October 2006, Verizon and Midco began negotiations to establish an agreement between the two carriers to establish direct trunks connecting Verizon's long-distance network to Midco's Sioux Falls Switch. *Id.* ¶ 24. Verizon wanted to establish direct trunks with Midco to avoid overflow problems with the CenturyLink Tandem and to avoid the tandem-switching charges that Verizon was paying to CenturyLink. *Id.* Midco knew about the two reasons Verizon wanted to establish direct trunking. *Id.* The parties executed the final Switched Access Service Agreement (Agreement) on March 7, 2007. *Id.* ¶ 33. The initial term of the Agreement was three years. *Id.* The Agreement was later renewed for another four years, after which the Agreement would renew on an annual basis. *Id.* ¶ 38.

Section 4 of the Agreement states:

4.1    Switched Access Charge Rates. The charges for minutes of use for Switched Access Service provided by Midco to MCI under this Agreement are as follows:
    4.1.1 MCI will pay Midco to terminate interstate traffic according to FCC tariff rates and intrastate traffic pursuant to rates under Midco tariff in South Dakota.
    4.1.2 MCI will pay Midco $250 per month per T1 and $500 installation charge per T1 for direct end office trunks for connectivity to the switching facilities listed in Attachment 1.

*Id.* ¶ 34.

Section 8.1 of the Agreement provides in part:

Subject to the audit rights below, MCI may initiate good faith disputes regarding billing and withhold payment up to six (6) months of its receipt of an invoice. Resolution of billing disputes will be handled according to the procedures in the dispute resolution section of this Agreement.

*Id.* ¶ 35.

Section 8.2 of the Agreement provides in part:

A Party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine the books and records of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Agreement if made within two (2) years after the month of Service delivery. Any disputes resulting from such audit shall be resolved in accordance with Section 9, Dispute Resolution below. All retroactive adjustments under this Agreement will be paid in full by the Party owing payment within thirty (30) days of notice and substantiation of such inaccuracy.

*Id.* ¶ 36.

Section 9 of the Agreement provides:

Any dispute between the Parties regarding the interpretation or enforcement of this Agreement or any of its terms shall be addressed by good faith negotiation between the Parties in the first instance, provided however, that MCI shall not be prohibited from withholding amounts billed and due, to the extent such withholding is based upon a good faith determination that the billed amount is in error. To the extent MCI withholds payments of such amounts and the related disputes are resolved in Midco's favor, MCI shall pay Midco simple interest on the withheld amounts in the amount of 1.5% per month until paid. Upon request of a Party, each Party will appoint a knowledgeable, responsible representative with decision-making authority to meet and negotiate in good faith to resolve any dispute arising out of or relating to this Agreement. Should such negotiations fail to resolve the dispute within (90) ninety days, the

Parties may, upon mutual agreement, submit the matter to alternative dispute resolution or, in the absence of such an agreement, either Party may initiate an appropriate action in any regulatory or judicial forum of competent jurisdiction.

*Id.* ¶ 37.

From January 2001 through March 2016, Verizon purchased direct trunks from Midco under § 4.1.2 of the Agreement. *Id.* ¶ 39. Until March 7, 2016, nearly all of the long-distance calls that Verizon and Midco exchanged traveled across those direct trunks. *Id.* The Agreement also stated in § 4.1.1 that Verizon would pay Midco for any switched access services provided at the rates outlined in the applicable tariffs. *Id.* ¶ 40. Thus, both parties agree that Midco was permitted under the Agreement to charge its tariffed rates for the services it provided. *Id.*

On October 27, 2010, Midco initiated complaint proceedings against Verizon relating to Midco's monthly billing statements for intrastate switched access services. *Id.* ¶ 42. On July 1, 2011, Midco and Verizon executed a Confidential Agreement and Release to resolve the action, and section 4 of that settlement agreement included a mutual release covering all access disputes between the parties concerning invoices dated on or before April 30, 2011. *Id.* ¶ 44.

Between March 2007 and January 2016, Midco billed Verizon monthly for switched access service, and Verizon paid Midco for tandem-switching charges until October 2015. *Id.* ¶ 45. Both parties agree that the validity of Midco's tandem-switching charges depends on whether the Sioux Falls Switch

functioned as a tandem switch on calls that Midco exchanged with Verizon's network. *Id.* ¶ 47. On March 7, 2016, Midco terminated the Agreement and disconnected the direct trunks connecting Verizon's network to the Sioux Falls Switch. *Id.* ¶ 64. Midco understood that the March 7 disconnection would require Verizon to find an alternative way to exchange traffic with Midco's network. *Id.* ¶ 65. Verizon chose to exchange that traffic through two new routes: (1) the CenturyLink Tandem, and (2) other long-distance companies with whom Verizon has wholesale relationships. *Id.* ¶ 65. Verizon alleges that it has incurred costs associated with re-routing long-distance calls using the above described routes. *Id.* ¶ 66.

After the March 7, 2016 disconnection, Midco stopped billing Verizon tandem-switching charges. *Id.* ¶ 70. It continues to bill Verizon end-office switching charges and tandem-mileage charges. *Id.* On July 27, 2017, Verizon sent Midco a dispute notice that disputed additional tandem-switching and tandem-mileage charges that Midco had billed prior to the March 2016 disconnection and that calculated interest on the disputed amounts. *Id.* With respect to interstate calls, Verizon disputed tandem-mileage charges that Midco billed between November 8, 2013 and April 8, 2016. *Id.* As to intrastate calls, Verizon disputed tandem-mileage charges that Midco billed between January 8, 2011 and April 8, 2016. *Id.* Verizon disputes $1,067,027.70, not including interest, in tandem switching and tandem mileage charges. *Id.* ¶ 71.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no

9

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.' " *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). On a motion for summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Under Fed. R. Civ. P. 56(d), the nonmoving party may also request a continuance until the nonmovant has had adequate time for discovery to

justify his opposition to the other party's motion for summary judgment. *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 894 (8th Cir. 2014) (citations omitted). A party moving for a Rule 56(d) continuance must file an affidavit showing how postponement of ruling on the motion for summary judgment will allow him to elicit more facts in discovery that are "essential" to rebut the summary judgment motion. *Id.* A district court has "wide discretion" in ruling on a Rule 56(d) motion. *Id.* at 895.

Both Midco and Verizon move for summary judgment on Midco's claims for breach of contract and declaratory judgment and for summary judgment on Verizon's counterclaims for breach of contract. As an initial matter, Verizon previously filed a motion for summary judgment. Docket 31. Midco subsequently moved for leave to amend the complaint under Fed. R. Civ. P. 15(a) and Verizon did not object. Docket 38. The court granted Midco's motion. Docket 39. Thus, Midco's previous motion for summary judgment (Docket 31) is denied as moot.

## DISCUSSION

## I. Verizon's Counterclaims are Partially Time-Barred.

### A. Applicable statutes of limitations

Midco argues that both of Verizon's counterclaims are time barred under federal law. Title 47 U.S.C. § 415(c) governs the statute of limitations on claims of overcharges and states:

> For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues, and not after,

subject to subsection (d) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

47 U.S.C. § 415(c).

Verizon acknowledges that its counterclaim for breach of the federal tariff is limited by the two-year statute of limitations contained in § 415(c), but argues that its counterclaim for breach of the state tariff is controlled by the six-year statute of limitations on contract claims under South Dakota law. *See* SDCL § 15-2-13.

Midco cites to *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669 (8th Cir. 2009) and *Firstcom, Inc. v. Qwest Commc'ns*, 618 S. Supp. 2d 1001, *aff'd*, 555 F.3d 669 (8th Cir. 2009) as support for its argument that § 415(c) applies to Verizon's claims for breach of the state tariff. In *Firstcom*, the district court held, and the Eighth Circuit affirmed, that Firstcom's negligence claim was preempted by federal law because it sought recovery for breach of a duty imposed by federal law. *Firstcom*, 555 F.3d at 678. In contrast, the court found that Firstcom's promissory estoppel and fraud claims were not preempted by federal law because the alleged conduct amounted to a violation of state common law, regardless of the federal law. *Id.*

Here, Verizon's counterclaim for breach of the state tariff is not premised merely on a violation of federal law. If the Federal Communications Act did not exist, Verizon would still have a claim for breach of contract because the

parties entered into a valid intrastate tariff sanctioned by state law[1] and Midco would not be permitted to breach the contract. Thus, the alleged wrong was not created by federal law and the six-year statute of limitations imposed by SDCL § 15-2-13 is applicable to Verizon's counterclaim for breach of state tariff.

### B. Notice provisions in tariffs and Agreement

Midco contends that Verizon is barred from filing this dispute because it did not conform with the notice provisions detailed in the tariffs and Agreement. The federal tariff states "Any claim must be submitted to the Company within 180 days of receipt of billing for the disputed services . . . . If the Customer does not submit a claim in accordance with the procedure described in this Section 2.11, the Customer waives all rights to filing a claim thereafter." Docket 46-1 at 22. The state tariff includes identical language. Dockets 46-2; 46-3; 46-4. The notice provision in the Agreement states "Subject to the audit rights below, MCI may initiate good faith disputes regarding billing and withhold payment up to six (6) months of its receipt of an invoice. Resolution of billing disputes will be handled according to the procedures in the dispute resolution section of this Agreement." Docket 46-8 at 4. Section 7 of Midco's FCC tariff and state tariffs indicates that the Agreement controls as to any services related to the tariff. Dockets 46-1; 46-2; 46-3; 46-4.

As to the federal tariff, courts have consistently held that notice provisions in tariffs cannot require a party to take action within a shorter

---

[1] *See also* Final Decision & Order, *Black Hills Fibercom, L.L.C. v. Qwest Corp.*, CT03-154, 2005 WL 783414, ¶ 46 (S.D.P.U.C. Feb. 24, 2005).

period of time than the two-year statute of limitations provided in § 415(c). *See* Memorandum Opinion & Order, *Sprint Commc'ns Co. L.P. v. N. Valley Commc'ns*, LLC, 26 FCC Rcd. 10780, ¶ 14 (2011), *aff'd N. Valley Commc'ns, LLC v. FCC*, 717 F.3d 1017 (D.C. Cir. 2013); *PAETEC Commc'ns, Inc. v. MCI Commc'ns Servs., Inc.*, 712 F. Supp. 2d 405, 41-6-17 (E.D. Pa. 2010); *Great Lakes Commc'n Corp. v. AT&T Corp.*, No. 13-cv-4117, 2014 WL 2866474, at *23 (N.D. Iowa June 24, 2014); *Bowers v. Windstream Ky. E., LLC*, 709 F. Supp. 2d 526, 539-40 (W.D. Ky. 2010). Here, Midco's tariff requires customers to raise disputes within 180 days, a period shorter than the applicable statute of limitations, or otherwise it waives its rights to file a claim. *See* Docket 46-1 at 22. Such a provision hinders a customer's ability to exercise its statutory right, *Northern Valley Order*, ¶ 14, and the provision is invalid.

The same reasoning applies to the state tariff. South Dakota has consistently held that no contractual provision can shorten the time for an action on the contract. *See Leuning v. Dornberger Ins., Inc.*, 250 N.W.2d 675, 676 (S.D. 1977). "A surety can *limit* the *extent* of its liability, but not the *time* for bringing suit." *Sheehan v. Morris Irrigation*, 410 N.W.2d 569, 570-71 (S.D. 1987) (emphasis in original). Thus, the provision in the state tariff is also void.

Midco argues that the provision in section 8.1 of the Agreement is distinguishable from other cases because it simply requires Verizon to notify Midco of any billing disputes and is not an attempt to unlawfully shorten the statute of limitations. Midco cites to several cases from other states that distinguish between notice provisions and waiver provisions. *See* Docket 56 at

11. But South Dakota has not recognized such a distinction and the law is clear that "[e]very provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals, or limiting his time to do so, is void." SDCL § 53-9-6. Further, the provision does not bar Verizon's claim. Section 8.1 states with permissive language that Verizon "may initiate good faith disputes" within six months of an invoice. Docket 46-8 at 4. And it does not state that Verizon waives its ability to raise disputes if it does not raise them within six months. So section 8.1 does not prohibit Verizon from bringing its counterclaims, and to interpret the section as a waiver of Verizon's right to bring a claim, would render the section void under SDCL § 53-9-6. Thus, Verizon's claims as to interstate calls made before May 24, 2014 are time barred by § 415(c). And Verizon's claims for intrastate calls made before May 24, 2010 are time barred by SDCL § 53-9-6.

###   C.   The parties' Agreement and Release

On July 1, 2011, the parties entered into a Confidential Agreement and Release. Docket 46 ¶ 42. Section 4 of the Agreement and Release includes a mutual release covering all access disputes between the parties related to invoices dated on or before April 30, 2011. *Id.* ¶ 44. The current dispute relates to invoices between Midco and Verizon. Thus, under the Agreement and Release, Verizon cannot challenge any billing disputes related to invoices dated on or before April 30, 2011.

###   D.   Filed-Rate Doctrine Bars Equitable Defenses

Section 203(c) of the Communications Act provides that "[n]o carrier,

unless otherwise provided by or under authority of this chapter, shall engage or participate in [wire or radio communication] unless schedules have been filed and published in accordance with the provisions of this chapter. . . ." 47 U.S.C. § 203(c). It requires CLECs such as Midco to assess interstate access charges against carriers such as Verizon "either by filing tariffs with the [FCC] or by negotiating contracts." *Sprint Commc'ns Co. v. N. Valley Commc'ns, LLC*, 26 FCC Rcd. 10780, 10782 (2011). So "until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts . . . for the access services it intends to provide, it lacks authority to bill for those services." *AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477, 3494 (2013) (*All American II*). The filed-rate doctrine provides that "once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Iowa Network Servs., Inc. v. Quest Corp.*, 466 F.3d 1091, 1097 (8th Cir. 2006) (quoting *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000)). Verizon claims that the filed-rate doctrine bars Midco's equitable defenses. The filed-rate doctrine provides that the Communications Act "preempts claims concerning the price at which service is to be offered, and . . . claims concerning the services that are offered." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 711 (5th Cir. 1999).

Midco alleges that all of Verizon's billing disputes are barred by the affirmative defenses of waiver, laches, and the voluntary payment doctrine. Docket 51 at 26-31. This court previously determined that the filed-rate

doctrine applies to this case, *see* Docket 12, so the court must then determine whether the doctrine bars Midco's defenses. There are two main principles underlying the filed-rate doctrine: "(1) nonjusticiability—'preserving the exclusive role of federal agencies in approving rates for telecommunications services that are reasonable by keeping courts out of the rate-making process . . .' and (2) nondiscrimination—'preventing carriers from engaging in price discrimination as between ratepayers.' " *Sancom, Inc. v. Quest Commc'n Corp.*, 643 F. Supp. 2d 1117, 1124 (D.S.D. 2009) (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998)). "The application of the filed-rate doctrine does not depend on the nature of the cause of action the plaintiff seeks to bring." *Id.* at 1125. "Rather, 'the focus for determining whether the filed-rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.' " *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992). To determine the impact of the court's decision, the court must evaluate the nature of Midco's affirmative defenses and the relief it seeks.

In South Dakota, waiver is established when "one in possession of any right, whether confirmed by law or contract, and with full knowledge of the material facts, does or forbears something inconsistent with the existence of the right or of his intention to rely on it." *Boxa v. Vaughn*, 674 N.W.2d 306, 311 (S.D. 2003). Similarly, laches is established where "the [claiming party] must be guilty of unreasonable and inexcusable delay that has resulted in prejudice to the [other party]." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979) (citing *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 31 (1951). And the

voluntary payment doctrine is a long standing rule "that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered on the ground that the claim was illegal or that there was no liability to pay in the first instance." *Siefkes v. Clark Title Co.*, 215 N.W.2d 648, 651 (S.D. 1974).

Midco argues that Verizon knew that Midco billed for tandem switching services for nine years under the tariffs and Agreement before it finally contested the charges, and thus, has waived its right to challenge the charges. Verizon now claims that Midco billed for tandem switching services that it did not provide—violating the terms of the tariffs, Agreement, and law. Thus, both parties agree Verizon's counterclaims arise from the type of services (tandem switching services) specifically covered by the tariffs.

Because the services at issue are covered by the applicable tariff, Midco cannot use an equitable defense against Verizon's claims because the terms of the tariffs exclusively enumerate the rights between the parties. Taking Verizon's claims and Midco's defenses as true, the nonjusticiability prong of the filed-rate doctrine would be implicated because permitting Midco to keep fees that it wrongfully charged in violation of the tariffs infringes on "the exclusive role of federal agencies in approving rates for telecommunications services that are reasonable by keeping courts out of the rate-making process." *Sancom, Inc.*, 643 F. Supp. 2d at 1124. "The filed rate doctrine prohibits a carrier from collecting charges for services that are not described in its tariff." *PAETEC Commc'ns, Inc.*, 712 F. Supp. 2d at 417 (finding that the filed-rate doctrine bars

equitable relief based on the voluntary payment doctrine) (citing *Am. Tel. & Tel. Co. v. Cent. Office Tel.*, 524 U.S. 214, 222 (1998)). Thus, the filed-rate doctrine bars Midco's equitable defenses because Midco cannot keep charges that it collected in violation of the tariffs.

In conclusion, Verizon's counterclaims are timely under the applicable statute of limitations and the parties' Release as to all charges on interstate calls on or after May 24, 2014 and on all charges on intrastate calls on or after April 30, 2011. Additionally, Midco's equitable defenses are barred under the filed-rate doctrine.

## II.    **Tandem Switching Services**

### A.    **Services Midco may charge**

Verizon's dispute with Midco's billing initially began because Verizon believed that Midco was unlawfully charging for tandem switching services. Verizon argues that the one-switch-one-rate rule prohibits Midco from charging for both end-office and tandem switching services because Midco only used one switch—the Sioux Falls Switch. Under 47 C.F.R. § 61.26(a)(3), the FCC defines switched exchange access services as the following:

> The functional equivalent of the ILEC interstate  exchange access services typically associated with the following rate elements: Carrier common line (originating); carrier common line (terminating); local end office switching; interconnection charge; information surcharge; tandem switched transport termination (fixed); tandem switched transport facility (per mile); tandem switching;
> (ii) The termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. 153(36),

that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used.

47 C.F.R. § 61.26(a)(3) (2012). The FCC further clarified its regulations in § 61.26(a)(3) in the Eighth Report & Order & Fifth Order on Reconsideration, *Access Charge Reform*, 19 FCC Rcd. 9108, ¶ 21 (2004) (*Eighth Report and Order*) and the Order, *Access Charge Reform*, 23 FCC Rcd. 2556, ¶ 26 (2008) (*Cox Clarification Order*). "It is well established that where administrative regulations are ambiguous on their face, the court should look to the construction which the responsible agency has given them." *Kickapoo Oil Co., Inc. v. Murphy Oil Corp.*, 779 F.2d 61, 65 (Temp. Emer. Ct. App. 1985) (quoting *Standard Oil Co. v. Dep't of Energy*, 596 F.2d 1029, 1055 (Temp. Emer. Ct. App. 1978)).

In the *Eighth Report & Order*, the FCC clarified the rules on what services CLECs could charge IXCs. *Eighth Report & Order*, ¶ 10. The FCC stated that "[t]he rate elements identified in section 61.26(a)(3) reflect those services needed to originate or terminate a call to a LEC's end-user." *Id.* ¶ 13. And "[w]hen a competitive LEC originates or terminates traffic to its own end-users, it is providing the functional equivalent of [switched access] services . . . ." *Id.* Thus, a CLEC may charge the full benchmark rate for switched access service when it provides "the functional equivalent of the services associated with the rate elements listed in 61.26(a)(3)." *Id.* Ultimately, the FCC stated that if a CLEC switch "is capable of performing both tandem and end-office functions,

the applicable switching rate should reflect only the function(s) actually provided to the IXC." *Id.* ¶ 21.

The FCC provided further clarification in the *Cox Clarification Order*. Cox Communications requested clarification from the FCC "that competitive LECs with multiple switches in a serving area may levy both tandem and end-office switching charges when their switches actually perform both functions." *Cox Clarification Order*, ¶ 22. The FCC granted Cox's clarification stating that competitive LECs can charge "for both tandem and end office switching when these functions are provided by separate switches" and applied the principle "to a situation where a single switch is capable of providing tandem and end office functions." *Id.* ¶ 26. The FCC stated that "the Commission found that competitive LECs can charge the end office switching rate when they originate or terminate calls to end users, and the tandem switching rate when they pass calls between two other carriers." *Id.* These clarifications do not impose a hardline "one-switch-one-rate" rule as Verizon argues. Instead, the FCC clarified that CLECs can charge for both end office and tandem switching services when CLECs provide both services—even when those services are performed by a single switch.

But Verizon argues to the contrary and relies heavily on an amicus brief that was submitted by the FCC to support its one-switch-one-rate argument. *See Brief for FCC as Amicus Curiae, PAETEC Commc'ns, Inc. v. MCI Commc'n Servs., Inc.*, Nos. 11-2268, et. al (3d. Cir. Mar. 14, 2012). But only "[i]n the absence of any unambiguous statute or regulation, [do] we turn to the FCC's

interpretation of its regulations in its amicus brief." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 59 (2011). Here, the FCC's explanation in its *Eighth Report & Order* is clear—that a CLEC may charge for the services it provides even where it simply provides the functional equivalent of switched access service from a single switch. Thus, the court does not consider the arguments made in the amicus brief and instead finds the FCC's interpretations controlling. *See United States v. Larionoff*, 431 U.S. 864, 872 (1977); *Kickapoo*, 779 F.2d at 67. So, based on the FCC's interpretations in the *Eighth Report & Order*, Midco was permitted to charge for tandem switching services if it provided the functional equivalent of those services.

**B.  Services Midco actually provided**

Verizon and Midco acknowledge that Midco provided end office switching services with the Sioux Falls Switch but disagree as to whether Midco provided the functional equivalent of tandem switching services. *See* Docket 51 at 2 ("The parties disagree, however, about the narrow issue of whether Midco provided tandem-switching services and related tandem mileage for which it billed."); Docket 49 at 11 ("[B]ecause the Sioux Falls Switch functioned as an end-office switch to which Verizon had directly connected, Midco had not transported Verizon's long-distance calls between its end-office switch and any tandem switch."). Thus, there is a question of fact as to whether Midco actually provided Verizon with the functional equivalent of tandem switching services.

The parties stipulate that a tandem switch is a switch that routes calls between other switches, *see* Docket 46 ¶ 13, and that an end-office switch

routes calls directly to and from end users. *Id.* The FCC tariff[2] defines "Access Tandem" as "A switching system that provides a traffic concentration and distribution function for originating or terminating traffic between end offices and a Customer's premises." Docket 46-1 at 9. Midco's Manager of Network Voice for Midcontinent Communications, Charles Fejfar, testified in his sworn affidavit that Midco's Sioux Falls Switch performed a tandem-switching function because:

> Verizon's traffic came in to Midco's switch through ports or trunks assigned to the tandem switching software. . . . Midco's switch then routed Verizon's traffic to the end-users or customers for which the calls were intended. A call reached or was terminated to the appropriate end-user through additional equipment called an embedded multimedia terminal adapter or EMTA, which was located at the end-user's business or home. The EMTA functions as an extension of Midco's Class 5 switch and enables the call to reach its final destination.

Docket 52-2 ¶¶ 7-8.

In contrast, Verizon's Product Manager in the Voice Services Group for Verizon Services Corporation, Peter J. D'Amico, testified in his sworn affidavit that "the Sioux Falls Switch does not function as a tandem switch" because it is "not registered in the LERG as a tandem switch" and "none of the Subtending Equipment is registered in the LERG as an end-office switch." Docket 46-21 ¶¶ 5-7. Where both parties rely on battling experts to establish a material fact, the fact is disputed. Thus, there is a dispute of fact between the parties as to whether or not Midco provided tandem switching services for Verizon. As a result, Midco's motion for summary judgment and Verizon's cross

---

[2] The state tariffs contain identical definitions. *See* Dockets 46-2; 46-3; 46-4.

motion on Midco's claims for breach of contract and declaratory judgment are denied.

## C.     Verizon's counterclaims

Verizon argues that even if it is incorrect as to its tandem billing dispute, it is still entitled to summary judgment because Midco terminated the direct trunks in violation of the Agreement. The Agreement permitted Midco to disconnect the direct trunks only if the Agreement was terminated for a "material breach." Docket 46-8. A material breach occurs if the breach threatens to "defeat the very object of the contract." *Thunderstik Lodge, Inc. v. Reuer*, 585 N.W.2d 819, 824 (S.D. 1998). Verizon was permitted to dispute and withhold charges based on a "good faith determination." Docket 46-8. Midco has presented evidence that Verizon did not act in good faith because it would not inform Midco as to why it was withholding payment, so Midco could not resolve the issue. *See* Docket 46 ¶¶ 47-48. Viewing the facts in the light most favorable to Midco, a reasonable jury could determine that Verizon's actions were not in good faith, regardless of whether it is successful on the tandem billing dispute, and that its decision to withhold payments for several months without explanation defeated the object of the contract. Thus, Verizon's motion for summary judgment on its counterclaims is denied.  Further, determinations of good faith are traditionally questions of fact properly left to a trier of fact, so Midco's cross motion for summary judgment on Verizon's counterclaims is also denied.

## CONCLUSION

In conclusion, Verizon's counterclaims are partially time barred by applicable statutes of limitation and the parties' Release. A question of fact exists as to whether Midco provided tandem switching services to Verizon. And there are also questions of fact as to whether Verizon materially breached the Agreement by withholding payments for services and acted in good faith and whether Midco breached the Agreement by disconnecting the direct trunks. It is,

ORDERED that Midco's first motion for summary judgment (Docket 31) is DENIED as moot. It is

FURTHER ORDERED that Verizon's updated motion for summary judgment (Docket 47) is DENIED. And it is

FURTHER ORDERED that Midco's motion for summary judgment (Docket 50) is DENIED.

DATED March 16, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE