UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MIDCONTINENT COMMUNICATIONS, <br><br> Plaintiff, <br><br> vs. <br><br> MCI COMMUNICATIONS SERVICES, INC., <br> d/b/a Verizon Business, <br><br> Defendant. | 4:16-CV-04070-KES <br><br><br> MEMORANDUM OPINION <br> AND ORDER |

Midcontinent Communications (Midco) brings suit against MCI

Communications Services, Inc., d/b/a Verizon Business (Verizon). Docket 1.

Midco seeks a declaratory judgment and damages against Verizon for breach of

contract. Docket 40. Verizon filed a counterclaim seeking damages against

Midco for breach of contract and state and federal tariffs. Docket 41. A court

trial was held on October 1, 2018. Docket 82. The court finds for Verizon on

Midco's breach of contract claim and Verizon's breach of contract counterclaim.

## I.  **FINDINGS OF FACT**

The following constitutes the court's findings of fact under Federal Rule

of Civil Procedure 52(a)(1), which were found by a preponderance of the

evidence:

Verizon is an interexchange carrier (IXC)[1] that operates throughout the United States. Docket 70 ¶ 9. Midco, a competitive local exchange carrier (CLEC),[2] is a cable company that provides many services, including local telephone services, to residential and business customers in South Dakota, North Dakota, Minnesota, and Kansas. *Id.* ¶¶ 1, 3. Midco's operations in South Dakota, North Dakota, and Minnesota are relevant to this dispute. *Id.*

Midco and Verizon's business relationship began around 2006. *Id.* ¶ 10. Midco provides switched-access services to Verizon. *Id.* ¶ 8. A LEC provides "switched-access service" when it permits IXCs to access its network to

---

[1] There are two types of telecommunications providers, local exchange carriers (LECs) and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs own the hardware that connects different local carriers to each other. An IXC offers long-distance telephone services to end-user customers and transmits long-distance calls between the networks of two LECs. When an individual makes a long-distance telephone call, the call originates on wires and facilities owned by the LEC serving the individual making the call and the call terminates over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively.

[2] LECs are divided into incumbent local exchange carriers (ILECs) and CLECs. "ILECs . . . operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the emergence of new LECs, the CLECs, to compete with the so-called 'Baby Bells.' " *Advamtel, LLC v. AT&T Corp.*, 118 F. Supp. 2d 680, 681 (E.D. Va. 2000). ILECs are required to file and maintain tariffs setting the rate for access service with the Federal Communications Commission (for purely interstate communications) or the applicable state utility commission (for intrastate communications). *In re Establishing Just & Reasonable Rates for Local Exchange Carriers*, 2007 WL 2872755, 22 FCC Rcd. 17989 at *17990 (2007) (notice of proposed rulemaking). In general, CLECs may file interstate access tariffs if the rate for access service is no higher than the rate charged for such services by the competing ILEC. *Id.* at *17994. CLECs may negotiate higher rates with IXCs. *Id.* Special rules apply to rural CLECs. *Id.*

terminate and originate long-distance calls to and from the LEC's end-user customers. *Id.* ¶ 7. When Verizon's long-distance customer calls or receives calls from Midco's local customers, Midco charges Verizon for switched-access services. *Id.* ¶ 10. Verizon was one of Midco's largest switched-access customers. Tr. 9-10.

## A. The Equipment

An essential part of a switched-access relationship is a switch. A switch is used to connect networks so that calls can be completed. Tr. 247. A switch has call-routing intelligence, which means the switch can identify the incoming call and properly route it. *Id.* To classify as a switch, the equipment must have the capability of routing the call to another place, switch, or station loop. *Id.* A station loop is the transmission medium from the switch, generally a Class 5 switch, to a specific customer premise. Tr. 171, 247-48.

There are a variety of different types of switches in the telecommunication industry. A Class 3 switch is an IXC switch that handles long-distance calls from specific regions. Tr. 251. A Class 3 switch possesses call-routing intelligence. Tr. 342, 343. A Class 4 switch (tandem) connects other tandem and end-office switches together and allows IXCs to have access to all of the end offices that subtend a particular tandem. Tr. 248.[3] A Class 5

---

[3] Midco's federal tariffs define an access tandem as "[a] switching system that provides a traffic concentration and distribution function for originating or terminating traffic between end offices and a Customer's premise." Joint Ex. 1 at 7; *see* Joint Ex. 2, 3, 4 (state tariffs filed in South Dakota, North Dakota, and Minnesota).

switch (end office) routes calls directly to and from end users. Docket 70 ¶ 13. To provide dial tone, a carrier must have an end office. Tr. 349. An end-office switch has a trunk connection on one side (connecting the switch to a tandem or another end office) and a line side on the other part of the switch where the station loops are connected. Tr. 248; Joint Ex. 1 at 8. On the station loop side, the switch identifies to which premise or end user location the call should be routed. Tr. 247-48.

Additionally, there is a switch that combines two switches' functionality into one piece of equipment. A Class 4/5 switch is a combination switch that has the physical capabilities of performing both tandem and end-office switching functions. Docket 70 ¶ 14. "But a Class 4/5 switch's ability to perform both functions does not mean that [the switch] actually performs both functions on every call that goes through it." *Id.*

Since 2006, Midco has operated a single switch in Sioux Falls, South Dakota. *Id.* ¶ 11. The switch (Sioux Falls Switch) is a GENBAND C20. Tr. 148. The Sioux Falls Switch is a Class 4/5 switch and has the ability to provide both tandem and end-office switching services. *Id.*; Docket 70 ¶ 14.

LECs and IXCs, including Midco and Verizon, use the Local Exchange Routing Guide (LERG), an industry-standard database, to make call-routing decisions and to review other carriers' equipment. Docket 70 ¶ 15; Tr. 260. Each carrier is responsible for supplying the LERG with information about its switches and equipment. Docket 70 ¶ 15. The LERG was not designed for billing. Tr. 338. Both parties consider the LERG to be a reliable database.

Docket 70 ¶ 15; Tr. 80, 260. But an equipment's registration in the LERG is not dispositive. Tr. 216. Charles Fejfar, Midco's expert witness and former switch manager, testified that he would not definitively rely on the LERG to determine what type of equipment a particular carrier had. Tr. 216-17.

Beginning in 2011, Midco registered the Sioux Falls Switch on the LERG as an end-office switch only. Docket 70 ¶ 16; Ex. 111 at 3. The Sioux Falls Switch's LERG entry does not show that it performs tandem switching. Tr. 291; Ex. 111 at 3. Because the Class 4/5 indication on the LERG for the Sioux Falls Switch is left empty, a carrier looking at the LERG would conclude that the Sioux Falls Switch is not performing as a Class 4/5 switch. Tr. 292; Ex. 111 at 3.

According to the LERG, the Sioux Falls Switch "subtends" CenturyLink's tandem switch (CenturyLink Tandem). Docket 70 ¶ 16; Tr. 180-81. The CenturyLink Tandem is registered in the LERG as a tandem switch. Tr. 181; Ex. 111. A subtending relationship exists when calls are sent to one switch—here, the CenturyLink Tandem—and then routed onward to a second switch for termination—here, the Sioux Falls Switch. Docket 70 ¶ 16. Likewise, calls originating from the second switch—here, the Sioux Falls Switch—are routed to the first switch—here, the CenturyLink Tandem. *Id.*

A Common Language Location Identified (CLLI) Code is an industry standard for defining a type of hardware in a network. Tr. 165. A CLLI code provides several pieces of information like the city, state, and physical address of where the equipment is located. Tr. 262-63. The last three letters of the CLLI

Code generally identify the type of hardware. Tr. 166, 263. Companies that specialize in tandem switching use CLLI Codes that end with a T to signify that the equipment is a tandem. Tr. 166. A CLLI Code that ends in "DS0" is typically an end office. Tr. 263. The Sioux Falls Switch has a CLLI Code of SXFLSDPSDS0. Docket 70 ¶ 11. Mr. Fejfar testified that it does not end in a T because Midco is not in the business of public tandem switching and does not want to show in the LERG or advertise that its switch is a tandem. Tr. 167.

Calls exchanged between IXCs and LECs can also be routed through "trunk groups." A trunk group is a group of individual digital channels that are built to perform a certain function. Tr. 152. The type of communication and the type of billing record produced determines the service being provided by the trunk group. Tr. 158-59. Additionally, the purpose of the trunk group is based on what the trunk is connected to, i.e. whether it is connected to a tandem or end-office switch. Tr. 152-53. Two kinds of trunk groups that are relevant to this dispute are trunks that connect directly to a tandem, Access Tandem to Carrier trunks (ATC), and trunks that connect directly to an end office, Intertoll Trunks (IT) or Direct End Office Trunks (DEOTs). Tr. 187.

DEOTs do not route calls through a tandem; instead, the calls are routed directly to an LEC's end office or Class 5 software. Tr. 187, 203. Additionally, IT trunks or DEOTs do not create a proper billing record for calls that interface directly from the carrier to the Class 5 software. Tr. 185, 209. Generally, no billing record is generated because the LEC assumes that another switch in the call path will generate the billing record. Tr. 210. Midco could have set up its

trunk group as DEOTs and allowed Verizon to connect directly to Midco's end-office software. Tr. 185, 191, 237. If the trunk groups were set up as DEOTs, the Sioux Falls Switch would only have performed end-office switching services. Tr. 191, 238.

LECs use ATC trunk groups to connect the tandem to a carrier because it creates a billing record that can be processed downstream. Tr. 157-59. An ATC trunk group creates a call code on an originating call. Tr. 159. The creation of the call code allows for billing records to be generated because the carrier code would be input into the billing records. *Id.* Without this trunk group and its creation of the billing record, Midco could not bill tandem switching charges. *Id.* The ATC trunk group is what distinguishes which software Midco would use to route a call. Tr. 208-09. The ATC trunk group enabled Midco to provide both tandem switching and end-office switching. Tr. 227. With an ATC connection between Midco and a carrier, any long-distance call would have to go through the Class 4 and Class 5 software on the Sioux Falls Switch. Tr. 187.

Additionally, calls exchanged between Midco and Verizon travel through Midco's Embedded Multimedia Terminal Adaptors (EMTAs). Docket 70 ¶ 18. EMTAs are small boxes that reside inside every Midco end-user customer's premises. *Id.* Generally, LECs provide this equipment, also known as Optical Network Terminals, to their end-user customers to enable those customers to interface with the LEC's network. *Id.* EMTAs convert incoming voice/digital signals traveling across Midco's network into an analog form capable of being

interpreted by a customer's traditional telephone. *Id.*; Tr. 153. EMTAs complete the call process and are a necessary component to making or terminating a call. Tr. 153. EMTAs connect directly to the Sioux Falls Switch. Tr. 84. EMTAs are not capable of routing in-bound calls to any destination other than the phones within the connected premise. Docket 70 ¶ 18. Likewise, EMTAs are not capable of routing out-bound calls to any destination other than the Sioux Falls Switch. *Id.* Midco does not allow long-distance carriers to connect directly into its end users' EMTAs. *Id.*; Tr. 193-94.

EMTAs are not separate end-office switches. Tr. 361. EMTAs do not have CLLI Codes because an EMTA is not a switch, though it is part of the switching process. Tr. 167-68. Like other LECs, Midco does not register its roughly 10,000 EMTAs in the LERG. Docket 70 ¶ 18. EMTAs do not have call-routing intelligence. Tr. 169. The call-routing function of the Sioux Falls Switch is not extended to the EMTA. Tr. 199. EMTAs do not connect other station loops to each other. Tr. 361. Also, while EMTAs do not provide a dial tone, the Sioux Falls Switch's Class 5 software does. Tr. 349.

**B. Midco and Verizon's Business Relationship**

All long-distance calls Verizon exchanges with Midco's network travel through the Sioux Falls Switch on their way to or from Midco's end-user customers who are located in South Dakota, Minnesota, and North Dakota. Docket 70 ¶ 11. There is no alternative way for these long-distance calls to be completed. *Id.* There are two ways IXCs can exchange calls with Midco's network. *Id.* ¶ 13. First, the IXC can establish a "direct trunk." *Id.* This

connects the IXC's network directly to Midco's network either by connecting with the Sioux Falls Switch itself or with a Midco Gateway that connects into the Sioux Falls Switch.[4] *Id.* Under this first option, the long-distance carrier can send or receive calls directly from the Sioux Falls Switch. *Id.* Second, the IXC can send calls to Midco's network via another LEC's tandem switch. *Id.*

Before 2007, Verizon exchanged long-distance calls with Midco's network primarily by sending to and receiving calls from the CenturyLink Tandem. *Id.* ¶ 20. A Verizon long-distance call destined for a Midco end-user customer would travel from Verizon's network to the CenturyLink Tandem, the CenturyLink Tandem would route the call to the Sioux Falls Switch, and the Sioux Falls Switch would then route the call to the appropriate end-user. *Id.*; Tr. 262. A Midco end user's long-distance call would take the same path in the opposite direction. Docket 70 ¶ 20. CenturyLink billed Verizon for tandem switching services. *Id.*

In October of 2006, Verizon reached out to Midco to discuss the possibility of negotiating an interconnection agreement. *Id.* ¶ 24. Bonny Smith, a Verizon employee in its National Carrier Contracts and Initiatives Group, and Nancy Vogel, Midco's Director of Regulator Finance, were the two primary

---

[4] In addition to the Sioux Falls Switch, Midco operates "Gateways." Docket 70 ¶ 12. Gateways are pieces of equipment that function as points of interface that allow other carriers to connect and deliver calls to Midco's network. *Id.* Gateways extend the switch beyond its original footprint. Tr. 151. Once the gateways receive calls from other carriers, the gateway carries the call to the Sioux Falls Switch. Docket 70 ¶ 12. Every call that travels via the gateway must travel through the Sioux Falls Switch. *Id.*

points of contact between the parties during the negotiation of the interconnection agreement. *Id.* ¶¶ 25, 26. On March 7, 2007, the parties executed the Switched Access Service Agreement (the Agreement). Docket 70 ¶ 33; *see* Joint Ex. 8. The Agreement's initial term was three years. Tr. 24.

The switched-access rates are contained in section 4.1 of the Agreement:

> 4.1.1   MCI will pay Midco to terminate interstate traffic according to FCC tariff rates and intrastate traffic pursuant to rates under Midco tariff in South Dakota.
> 4.1.2.  MCI will pay Midco $250 per month per T1 and $500 installation charge per T1 for direct end office trunks for connectivity to the switching facilities listed in Attachment 1.

Joint Ex. 8. From 2007 to January 2016, Midco's federal and state tariff switched-access rates mirrored the tariffed switched-access rates charged by CenturyLink. Docket 70 ¶ 23. Under section 4.1.1, Midco could charge its tariffed rates for the particular services it provided. *Id.* ¶ 40; *see* Joint Ex. 1 (federal tariff); Joint Ex. 2, 3, 4 (state tariffs for South Dakota, North Dakota, and Minnesota). But the mere existence of a rate element in a tariff did not necessarily mean that Midco was entitled to charge Verizon that rate element on every call. Docket 70 ¶ 40.

Section 8.1 of the Agreement detailed the parties' dispute procedure:

> Subject to the audit rights below, MCI may initiate good faith disputes regarding billing and withhold payment up to six months of its receipt of an invoice . . . .

Joint Ex. 8.

Section 9 of the Agreement provided additional information on resolving the parties' disputes:

> Any dispute between the Parties regarding the interpretation or enforcement of this Agreement or any of its terms shall be addressed by good faith negotiations between the Parties in the first instance, provided however, that MCI shall not be prohibited from withholding amounts billed and due, to the extent such withholding is based upon a good faith determination that the billed amount is in error . . . . Upon request of a Party, each Party will appoint a knowledgeable, responsible representative with decision-making authority to meet and negotiate in good faith to resolve any dispute arising out of relating to this Agreement . . . .

*Id.*

The Agreement laid out the termination provisions in section 2:

> Either Party may terminate this Agreement for material breach by the other Party upon thirty (30) days notice, provided that the other Party fails to cure said material breach within said thirty (30) day period, and provided further that any term of the Agreement that is reasonably calculated to survive in order to fulfill the intent of the Parties under this Agreement shall survive such termination.

*Id.*

On March 3, 2010, Midco and Verizon executed Amendment Number One to the Agreement. Docket 70 ¶ 38; Joint Ex. 9. The Amendment extended the term of the Agreement four years, after which time the Agreement would renew on an annual basis absent timely notice of termination. Docket 70 ¶ 38. The Amendment did not make any other changes to the rates or terms. *Id.*; Tr. 26.

Pursuant to the Agreement, Verizon purchased 19 direct trunks from Midco and paid the agreed-upon charges for some time. Docket 70 ¶ 39. Although the Agreement stated Verizon would pay a monthly fee and an installation charge per T1 for "direct end office trunks" (Joint Ex. 8), Midco did

not install DEOTs. Tr. 203. Instead, Midco installed an ATC trunk group to connect its tandem to Verizon's network. Tr. 157-58.

With the Agreement in place, when a non-local Verizon customer made a call to a local Midco customer, the call traveled through various steps. Tr. 162-63. The Verizon customer would originate the call by dialing the desired telephone number. *Id.* Verizon's switch would route the call to a T1 on its network. Tr. 163. The T1 carried the call across the country until it reached the Sioux Falls Gateway. *Id.* The Sioux Falls Gateway, built as an ATC trunk group, was interfaced directly into the tandem side of the Sioux Falls Switch. Tr. 163, 223. The Class 4 software of the Sioux Falls Switch received the call, generated a call record to bill Verizon, and provided tandem switching services. Tr. 163, 204. The Class 4 software performed tandem switching services by interpreting the digits dialed and deciding where to route the call. Tr. 163, 204. The Class 4 software interpreted digits by looking at the NPA-XXX and determining if that NPA-XXX resided on the Class 5 switch. Tr. 205. If the desired end user was located at Midco's end office, the call was routed from the Class 4 software to the Class 5 software. Tr. 163. The Class 4 software interpreted the digits before the call was routed to the Class 5 software. Tr. 204. If the desired end user was not located at the Midco end office, the Class 4 software would route the call to another trunk group if one was interfaced with the Sioux Falls Switch's Class 4 software. Tr. 163. The Class 5 software then performed end-office switching by determining to which subscriber the call was directed and terminating the call to the desired end user. Tr. 163, 205-06. The

12

call could not be completed without the use of both end-office and tandem switching functionality. Tr. 160.

When a local Midco end-user customer made a long-distance call to a Verizon customer, the Class 5 software provided the dial tone and interpreted the digits. Tr. 155, 157. The Class 5 software then decided how to route the call by determining whether the call was local or long-distance. Tr. 157; *see* Tr. 155-56 (describing in greater detail the digit interpretation process). If the call was long-distance, the Class 5 software would hand the call off to the Class 4 software. Tr. 156, 191. Once the call was at the Class 4 software, the software routed the call to the gateway, ATC trunk, converted the call to a T1 signal, and sent it out to Verizon. Tr. 156. All long-distance calls must traverse the tandem switch in order to be handed off to a carrier. Tr. 157.

### C. The Billing Dispute

Midco provided Verizon with switched-access services and billed Verizon for tandem switching, end office switching, and tandem switch facility. Docket 70 ¶¶ 41, 47; Tr. 19. Tandem switching is charged when the tandem determines to which end office it should send the call and routes the call there. Tr. 255. End-office switching is charged when the Class 5 switch determines and routes the call to the specific end user associated with the dialed telephone number. Tr. 178, 257. Tandem switch facility is a mileage-based charge for the work Midco performs transporting long-distance calls between the tandem switch and the end-office switch. Docket 70 ¶ 47; Tr. 256-57.

Verizon approved and paid Midco's invoices billed amounts—which included the three service charges above—from 2007 until the October 2015 invoice. Docket 70 ¶ 45. The invoices sent to Verizon from Midco were in an electronic format. Tr. 20; *see* Ex. 19. When Verizon approved payment of the invoices, Verizon saw "face-page detail." Tr. 454. Viewable from a summary page of an invoice, a reviewer of the bill would be able to determine whether a particular rate element was being charged. Tr. 23. These invoices were routed through a billing software where Verizon approved or denied it for payment. Tr. 454. If there was not a large variance in the amount billed, Verizon typically released it for payment. *Id.*

After payment, Verizon's invoice validation department, a group dedicated to audit invoices, then decided which invoices to audit. Tr. 23, 381. Audits are conducted based on identified risks or areas Verizon wanted to look at more closely. Tr. 451-52. Depending on the chosen audit, Traci Morgan, senior manager in the invoice validation department, and her team would write a query to pull the desired information and perform an analysis on the information. Tr. 452-53. Nearly all of Midco's invoices were audited in some manner every month. Tr. 430-31. For over nine years, however, Verizon never engaged in any auditing of Midco's tandem switching charges. Tr. 469.

When Verizon's group found an error in an invoice, they would file a dispute by quantifying the overbilled amount and then send a dispute communication to the vendor. Tr. 382. This started the dispute resolution process. Tr. 392-93. The vendor would have the opportunity to review the

dispute and decide to agree with Verizon's dispute or disagree and send a dispute denial. Tr. 392.

Generally, during a dispute, Verizon withheld the charges the vendor billed Verizon. Tr. 382-83. Verizon would start withholding payment immediately after the error was identified. Tr. 389. This sometimes occurred even before Verizon filed a dispute with the vendor. *Id.* If Verizon had already paid the bill and then identified an error, Verizon looked to see if that error was still occurring on the current invoices. *Id.* If so, Verizon withheld payment on those charges and subsequent invoices. *Id.* Verizon would also withhold payments on those same invoice's undisputed amounts to recover prior overpaid amounts. Tr. 383-84. In withholding undisputed amounts, Verizon only did so for same service types. Tr. 384. When Verizon withheld money, vendors could charge interest if the dispute was resolved in favor of the vendor. Tr. 388-89. The interest rate for Midco was 1.5% per month. Tr. 436.

In early fall of 2015, Ms. Morgan noticed that Verizon had more tandem switching charges than she was accustomed to seeing. Tr. 478. Verizon ran a query against its billing system and pulled all CLEC's tandem switching billing. Tr. 479. Initially, an auditor pulled one month of usage, looked at the LERG details associated with the CLLI codes appearing on the bill, and researched the subtending information from the LERG. Tr. 478. Because of the inconsistencies in the results, the auditor did additional research to determine whether Midco owned a tandem switch. Tr. 477-78. The auditor pulled more usage information from other months and did additional research in the LERG.

Tr. 479. Ms. Morgan stated it was typical to rely on the LERG when auditing and assessing CLEC bills. Tr. 478. The Sioux Falls Switch was only listed as an end-office switch, and the LERG did not show it was a Class 4/5 switch. Ex. 111.

Ms. Morgan also checked Verizon's share drive where it stores relevant contracts between Verizon and a vendor, however, she was not able to find the Agreement and thus she was not aware of its existence. Tr. 492. Additionally, Ms. Morgan reviewed the rates in the tariffs. Tr. 496. In late October of 2015, Verizon finished its audit and concluded Midco did not own a tandem. Tr. 486. The auditor began calculating a dispute. Tr. 479.

Ms. Morgan advised her auditor to hold payment for the October invoice until the auditor finished her calculations. Tr. 486. Verizon began to immediately withhold payment based on the fact that the tandem switching charge was over 50 percent of the monthly bill; Verizon considered it to be "too much" to allow it to continue. *Id.* The October invoice was due November 8, 2015. *Id.* Midco did not receive any payment from Verizon in November and December of 2015. Tr. 34. Verizon did not provide a written dispute notice in October, November, or December of 2015. *Id.*

On January 20, 2016, Verizon notified Midco, via a formal written notice (Joint Ex. 11), that it was disputing Midco's monthly tandem switching charges during the period of January 8, 2011 to January 8, 2016. Docket 70 ¶ 48. Verizon disputed $654,258.53 of tandem switching charges. *Id.* ¶ 49. In its written dispute, Verizon notified Midco that the basis of its dispute was the

Eighth Order and Report and subsequent clarification, i.e., "one-switch, one-rate" rule. Joint Ex. 11.

The gap between the conclusion of the audit and the official dispute notice was approximately three months. Tr. 487. Ms. Morgan testified that it was not Verizon's intention to have such a gap. *Id.* Ms. Morgan stated that a lot of "unexpected situations" occurred during that time like an employee quitting without notice, employee training, litigation, and other escalated matters. *Id.*

Ms. Morgan personally authorized Verizon's dispute of Midco's tandem switching charges. Tr. 477. Ms. Morgan testified that she considered the dispute to be in good faith, and was confident that Midco was not providing tandem switching services. Tr. 488-90.

### D. Midco's Reaction

In January—before Verizon notified Midco about the dispute—Midco began discussing with its sales group whether it should continue to take business orders from Verizon in response to the nonpayment. Tr. 36. Midco did not take any action at that time. Tr. 37. One week after Midco received the formal dispute notice, it discontinued taking ethernet business orders from Verizon. Tr. 37, 397.

After Midco received the dispute notice, Midco reached out to Verizon. Tr. 97. Erin Ostler, Midco's Vice President of Sales, emailed Rachel Fetner, an employee in Verizon's carrier management group. Tr. 466-67; Ex. 28. In the email, Midco indicated to Verizon that Midco believed it was providing the functional equivalent of tandem switching service with its one switch. Tr. 468-

17

69; Ex. 28. Leslie Freet, Verizon's senior manager in the invoice validation department, received and reviewed this email, but she did not follow up with anyone at Midco. Tr. 469.

On January 22, 2016, Midco sent a written disconnection letter, entitled "NOTICE OF DEFAULT," to Verizon. Joint Ex. 12. Patrick Mastel, Midco's Associate General Counsel, drafted the letter. *Id.*; Tr. 46. The letter's subject pertained to Midco's rejection of Verizon's tandem switching disputes. Tr. 46-47. The letter notified Verizon of Midco's intent to disconnect the trunks and terminate the Agreement because Midco believed Verizon had filed the dispute in bad faith and was in breach of the Agreement. Tr. 404; Joint Ex. 12. Ms. Vogel testified that Midco sent the disconnection letter to put Verizon on notice and to get Verizon's attention that Midco was serious in wanting to discuss the dispute. Tr. 46. The second paragraph of the disconnection letter stated, "If the default is not completely corrected within 60 days of the receipt of this document, Midcontinent has no choice but to consider the agreements terminated. It will then disconnect all direct trunking between it and Verizon." Joint Ex. 12. The last sentence of the letter, however, states, "The date of disconnection will be March 4, 2016 . . . ." *Id.* Ms. Freet testified that she was surprised by this letter because Verizon "had only filed [its] dispute two days before, and Midco had not responded." Tr. 405. Verizon did not ask Midco to hold off on the disconnection and did not ask what alternatives were available besides the disconnection. Tr. 450.

## E. The Conference Calls

A series of three telephone discussions about the billing dispute occurred between the parties. After receiving the dispute notice from Verizon, Ms. Vogel believed that Midco should reach out and call Verizon. Tr. 37-38. Ms. Ostler reached out to her counterpart at Verizon, Scott Aurand, a Verizon Carrier Contract Management Group employee, to see if a call could be arranged to discuss the dispute. Tr. 38; Docket 70 ¶ 51. At this time, Ms. Ostler also informed Mr. Aurand that Midco would not be fulfilling any business contracts that Verizon would send to Midco. Tr. 38.

The first telephone call took place on February 8, 2016. Docket 70 ¶ 51. Midco's participants included Ms. Vogel and Andrea Livingston, Midco's Regulatory Analytics and Reporting Manager. *Id.* Verizon's participants included Ms. Freet and Mr. Aurand. *Id.* The participants covered topics like the long-distance calls' paths over the direct trunks set up by the Agreement and the basis for Verizon's dispute of Midco's tandem charges. *Id.* ¶ 52. During the call, Ms. Vogel informed Ms. Freet about the Agreement. *Id.* Ms. Freet stated that she and Mr. Aurand were unaware of the Agreement's existence. Tr. 400. Ms. Vogel testified that she was surprised Verizon was not aware of the Agreement, "particularly if they were auditing the bills against the Agreement." Tr. 43. Mr. Aurand found a copy of the Agreement in Verizon's archives. Tr. 41; Docket 70 ¶ 54. Ms. Freet indicated on the call that the usual purpose for those types of agreements was to eliminate tandem charges. Tr. 42. Ms. Vogel

countered that the Agreement dealt with blocking issues at the time and that is why tandem services were being charged. *Id.*

In regard to the billing dispute, Ms. Freet stated that Verizon's intention was to recoup the monetary amounts that it previously paid to Midco for tandem switching charges. Docket 70 ¶ 53. Verizon would recoup these amounts by withholding payment from other undisputed switched-access charges on future invoices. *Id.* In closing, the parties agreed to speak again in two weeks. *Id.* The call ended by Ms. Freet requesting that Midco send her a document that laid out Midco's network architecture and call flow and for another phone call. *Id.* ¶ 52; Tr. 44.

After the first call, on February 12, 2016, Ms. Vogel sent Ms. Freet an email containing the two documents requested: a Gateway Map and a Midco Gateway Cross Reference. Docket 70 ¶ 55; Joint Ex. 13. In that same email chain, Ms. Vogel asked Ms. Freet and Mr. Aurand whether they were aware that a disconnection letter had been sent. Tr. 46, 403-04; Ex. 21. Later, Ms. Vogel sent the two Verizon employees a copy of the disconnection letter by email. Tr. 47; Ex. 21.

A second phone call between the parties occurred on February 22, 2016, and lasted approximately thirty minutes. Docket 70 ¶ 59; Tr. 51. The call's participants included Ms. Vogel, Ms. Livingston, Ms. Freet, and Mr. Aurand. Docket 70 ¶ 59. Ms. Morgan also joined the call. *Id.* The parties discussed the Agreement, Midco's networks, the Gateway Map and the Gateway Cross Reference documents, the basis for Verizon's dispute, and the mileage charges.

*Id.*; Tr. 50. Ms. Freet informed Midco that if Verizon did not have the direct trunks into the Sioux Falls Switch, it would have to alternatively route the calls to the nearest ILEC tandem (CenturyLink Tandem). Tr. 116-17. The parties scheduled a third call because Verizon wanted additional time to consult with their legal team. Tr. 52; Docket 70 ¶ 59.

Ms. Vogel thought the second call went "fairly well." Tr. 52. Ms. Vogel testified that she was pleased that Verizon asked a lot of questions; she perceived that as hopeful that a resolution was possible. Tr. 52-53. But Ms. Vogel testified that she was surprised that Verizon did not raise the disconnection letter during the second call. Tr. 51. Ms. Freet testified that after the second call, she still believed that Verizon's dispute was valid because Midco did not own a tandem, and Midco was not providing tandem switching functionality. Tr. 408.

Following the second call, William Carnell, Associate General Counsel at Verizon, sent a letter to Midco on February 26, 2016, in response to Mr. Mastel's January 22 letter. Joint Ex. 14. In the letter, Mr. Carnell wrote that Verizon had no record of the disconnection letter until Ms. Vogel forwarded them a copy. *Id.* The letter illustrated that Verizon's position was that Verizon did not owe tandem switching charges because Verizon was directly connected to Midco's end office. *Id.*; Tr. 119. Mr. Carnell urged Midco to withdraw its disconnection letter. Joint Ex. 14. After reading the letter, Ms. Vogel perceived that Verizon was asking Midco not to engage in a rush to judgment—the

disconnection letter. Tr. 120. But Midco did not consider withdrawing its disconnection letter. *Id.*

A third phone call between the parties occurred on February 29, 2016. Docket 70 ¶ 61. The call's participants included Ms. Vogel, Ms. Livingston, Ms. Freet, and Mr. Aurand. *Id.* Ms. Freet inquired whether Ms. Vogel was aware that Mr. Carnell sent a letter to Mr. Mastel. Tr. 55. Ms. Vogel stated that she was aware; Ms. Freet recommended that Mr. Mastel respond in writing. *Id.* Ms. Freet informed Midco that Verizon was conducting a cost-benefit analysis on whether the direct trunk arrangement with Midco was saving Verizon money versus an alternate routing of the calls via the CenturyLink Tandem. Docket 70 ¶ 61. Although the cost-benefit analysis was not yet completed, the preliminary analysis suggested that the use of the direct trunks might be costing Verizon more than the CenturyLink Tandem alternative. *Id.* Ms. Freet stated that Verizon was working to finalize the analysis. *Id.* Also, Ms. Freet asked Ms. Vogel whether Midco wanted to have another call or whether the parties wanted to turn the dispute over to the attorneys. *Id.* Ms. Vogel said she would consult with Mr. Mastel and then respond to Ms. Freet. *Id.*

Ms. Vogel testified that after the third call she no longer felt hopeful. Tr. 57. She told her colleagues that she was not "making any headway with the business people" and that it would come down to a discussion between the parties' lawyers. Tr. 59, 122. Ms. Vogel felt that her explanations of the reasoning underlying the Agreement were not being heard by Verizon. Tr. 60.

Ms. Freet's position remained that the tandem switching charges were not valid. Tr. 409.

The third telephone call was the last discussion about the billing dispute between the parties' employees. Docket 70 ¶ 62. Ms. Vogel did not arrange for a fourth call based on the fact the attorneys were already in discussion about the dispute. Tr. 60. Verizon never updated Midco on the status or conclusion of its cost-benefit analysis, and Midco never contacted Verizon to learn the status of the cost-benefit analysis. Docket 70 ¶ 62.

After the third call, the parties' only conversations occurred between their respective lawyers. *Id.* The final communication between the parties about the tandem switching dispute was a letter drafted by Midco's attorneys dated March 1, 2016. Joint Ex. 15; Tr. 122-23. Mr. Mastel responded by letter to Mr. Carnell's February 26 letter. Joint Ex. 15; Docket 70 ¶ 63. Mr. Mastel replied that Midco was providing the functional equivalent of tandem switching. Joint Ex. 15. After no resolution resulted from the phone conversations, Verizon continued to withhold all switched access charges, even amounts that Verizon was not disputing. Tr. 61-62.

**F. Termination of the Agreement and Disconnection of the Trunks**

The phone calls between the parties and their lawyers were unsuccessful. Tr. 64. Midco terminated the Agreement and disconnected the direct trunks on March 7, 2016. Tr. 41, 65. At the time of disconnection, Verizon had not paid Midco for five months' invoices. Tr. 64.

Midco disconnected the trunks by blocking the calls coming in via the trunks, i.e. "busied out." Tr. 65, 213. Midco did not physically take the trunks down or fail the calls. *Id.* Instead, Midco redirected the calls to the CenturyLink Tandem. *Id.* Midco could have quickly and easily reenabled the trunks. Tr. 65, 174. Verizon, however, never contacted Midco about reconnection. Tr. 66.

In relation to the disconnection, Midco made only one change to its routing practice on the long-distance calls exchanged with Verizon's network. Docket 70 ¶ 67. Instead of using the direct trunks, Midco now exchanged calls with Verizon's network via the CenturyLink Tandem. *Id.* Besides this single change, the rest of the call flow remained the same as before the disconnection. *Id.* ¶ 68.

Midco was aware that the March 7 disconnection would require Verizon to find an alternate route to exchange its traffic with Midco's network. *Id.* ¶ 65; Tr. 123. In response to the disconnection, Verizon used two routes to exchange its traffic that previously traveled over the direct trunks. Docket 70 ¶ 65. Verizon used the CenturyLink Tandem and other long-distance companies with whom Verizon had wholesale relationships. *Id.* After the March 7 disconnection, Midco stopped billing Verizon tandem switching charges. *Id.* ¶ 70.

Without the Agreement, a call from a Midco customer to a Verizon customer would travel through the CenturyLink tandem. Tr. 165. The call would originate at the Midco end user and then travel to the Sioux Falls Switch's Class 5 software. Tr. 163-65. When the Class 5 software did a

subscriber look up, it would determine if the number dialed was destined for Verizon's network. *Id.* The call was then handed off to the Class 4 software of the switch and routed to a trunk group going to the CenturyLink Tandem. Tr. 165. Then, the CenturyLink Tandem routed the call to a Verizon trunk group, where the call entered Verizon's network. *Id.*

All long-distance calls that were routed via the ATC trunk group came through the Sioux Falls Switch's tandem side. Tr. 187, 191, 235. Midco did not bill Verizon for tandem switching even though Midco still provided tandem switching services on the call. Tr. 77, 218. Midco expected CenturyLink to bill Verizon for tandem switching, but Midco did not expect that both Midco and CenturyLink would bill for tandem switching. Tr. 221-22. Currently, Midco bills Verizon for end-office switching and tandem-mileage. Docket 70 ¶ 70. CenturyLink bills Verizon for tandem switching services. Tr. 306.

### G. Verizon's Second Dispute

On July 27, 2017, Verizon sent Midco a dispute notice pertaining to additional tandem switching and tandem-mileage charges that Midco billed prior to the March 2016 disconnection. Joint Ex. 16; Docket 70 ¶ 70. The new notice added an additional $681,000 to the dispute. Joint Ex. 16; Tr. 68. Verizon continued to withhold payment until the August 8, 2018 invoice. Tr. 133. As of August 1, 2018, Verizon recouped a total of $708,213.40 in tandem switching charges. Docket 70 ¶ 71. Ms. Vogel testified that she was surprised when she received this second dispute because she would have

thought Verizon would have included it in the first dispute, especially because it took months for the first dispute to be finalized and sent to Midco. Tr. 68.

### H. Lawsuit

At the end of 2016, Midco filed a breach of contract claim against Verizon. Docket 1, 40. Verizon filed a counterclaim. Docket 41. Both parties moved for summary judgment. Docket 31, 47, 50. The court denied the motions and scheduled the matter for trial. Docket 58. A court trial was held on October 1, 2018. Docket 82.

## II. LEGAL CONCLUSIONS

### A. Breach of Contract Claims

Both Midco and Verizon brought breach of contract claims. Under South Dakota law,[5] the elements of a breach of contract are: (1) an enforceable promise, (2) a breach of the promise, and (3) resulting damages. *Bowes Constr., Inc. v. S.D. Dep't of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). Here, the Agreement between Midco and Verizon is an enforceable promise. The material issue is whether the Agreement was breached by either party.

### 1. Verizon's Breach of Contract Counterclaims

The court will address Verizon's breach of contract counterclaims first. In Count I and II of Verizon's counterclaims against Midco, Verizon alleges that Midco violated the terms of Midco's state and federal tariffs and the Agreement.

---

[5] The court applies South Dakota substantive law to these claims. *See, e.g.*, *Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The parties agree that South Dakota law applies.

Docket 41 ¶¶ 23-34. In addition, Verizon specifically contends that Midco violated the tariffs and the Agreement by: (1) charging for intrastate and interstate switched-access services under Midco's state and federal tariffs (*id.* ¶¶ 24, 30) and (2) disconnecting Verizon's direct trunks (*id.* ¶¶ 26, 32).

### a. Verizon's Breach of the Agreement Counterclaim

In its counterclaims, Verizon alleges that the Agreement required Midco to install DEOTs and that because Midco installed ATCs instead, it could not charge for tandem switching services. Docket 41 ¶¶ 9, 11, 12. While Verizon's breach of contract claims did not specifically include the allegation that Midco breached the Agreement by installing the incorrect trunk group, the pleadings gave sufficient notice to Midco that such a claim was being alleged. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding the pleading rules only require "notice" pleadings and a court must construe allegations liberally); *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056-57 (8th Cir. 2004) (function of notice pleading is to give other party fair notice of nature and grounds for claim).

The court also finds that the parties tried by consent the issue of whether Midco breached the Agreement by installing the incorrect trunk group. Federal Rule of Civil Procedure 15(b)(2) states, "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." "A party's consent may be implied 'if evidence to support the claim was introduced at trial without objection.'" *Miller v. Mills Const., Inc.*, 352 F.3d 1166, 1171 (8th Cir. 2003)

(quoting *Shen v. Leo A. Daly Co.*, 222 F.3d 472, 479 (8th Cir. 2000)). Thus, under Rule 15(b)(2), the court considers the theory of breach of contract by installation of the incorrect trunk group tried and argued by the parties, regardless of whether it was included in the pleadings. *See id.*

Midco impliedly consented to this issue being tried because Midco itself presented evidence about the difference between DEOTs and ATC trunk groups, Midco's use of ATC trunk groups, Midco's ability to install DEOTs, and the provisions in the Agreement that required the installation of "direct end office trunks." In Verizon's post-trial response brief, Verizon argued that if Midco's use of ATC trunks changed the functionality of the Sioux Falls Switch, then Midco breached the Agreement by not installing DEOTs. Docket 87 at 19. In its reply brief, Midco did not object to Verizon's additional breach of contract argument. *See* Docket 88.

The Agreement required Midco to install "direct end office trunks." Joint Ex. 8. The Agreement specifically lists those four words and there is no ambiguity in the terms. The installation of DEOTs would have allowed Verizon to interface directly with the Class 5 software of the Sioux Falls Switch. Under the terms of the Agreement that required the installation of the DEOTs, Midco would only provide end-office switching and would not bill Verizon for tandem switching because there was no contractual agreement to provide that service. Instead of complying with the contract, Midco installed a different ATC Trunk group. That ATC trunk group interfaced directly into the Sioux Falls Switch, but also into the Class 4 software. This network setup allowed Midco to charge

for tandem switching, tandem-mileage, and end-office switching because the ATC trunk group routed all carrier calls through the tandem side. This interface, however, was not contemplated under the Agreement. Thus, the court finds that Midco breached the Agreement by installing the incorrect trunk group.

Midco breached the Agreement when it installed an ATC trunk group instead of the DEOTs. This is a material breach because the proper installation of the DEOTs would have given Verizon a direct interface into the Sioux Falls Switch's Class 5 software; thereby bypassing the Class 4 software and the tandem switching charges. Midco's installation of the ATC trunk group allowed Verizon to have a direct connection to the Sioux Falls Switch's Class 4 software, which allowed Midco to charge for tandem switching, tandem-mileage, and end-office switching.

### b. Verizon's Breach of State and Federal Tariffs Counterclaim

Verizon also contends that Midco breached the state and federal tariffs when it charged Verizon for switched-access service. Docket 41 ¶¶ 24, 30. This court stated in the order denying summary judgment that "CLECs can charge for both end office and tandem switching services when CLECs provide both services—even when those services are performed by a single switch." Docket 58 at 21. A CLEC "can charge the end office switching rate when they originate or terminate calls to end users, and the tandem switching rate when they pass calls between two other carriers." *Access Charge Reform*, 23 FCC. Rcd. 2556, ¶

26 (2008). Midco was permitted to charge for switched-access services under its tariffs if it provided the functional equivalent of those services even though Midco has a single switch.

A material issue for this allegation is whether the Sioux Falls Switch actually performed both tandem and end-office switching on a single call. The Sioux Falls Switch provided end-office switching on long-distance calls traveling over Midco and Verizon's networks. *See supra* p. 13. Additionally, the Sioux Falls Switch performed tandem switching. *See supra* p. 13. Midco provided both of these services on a single call traveling through the Sioux Falls Switch. Tr. 184-85. Midco was able to provide both services on a single call because of the type of trunk group installed by Midco. Tr. 227, 237.

Mr. Fejfar testified about the structure of Midco's network and how Midco's trunk group was set up. Tr. 184. Mr. Fejfar testified that the direct trunks connecting Verizon's network to Midco's network were called "Access Tandem to Carrier" Trunks. Tr. 157-58. An ATC trunk group connects directly into a switch's Class 4 software. Tr. 187. A long-distance call destined for a local end-user customer that travels over an ATC trunk group must go through a switch's Class 4 and Class 5 software. *Id.* Thus, the Sioux Falls Switch was performing both tandem and end-office switching. Tr. 184-85. Even Peter D'Amico, Verizon's expert witness and a product manager for voice services, testified that, as a matter of industry practice, if Midco had structured its network to perform both services, tandem and end-office switching, it could bill

for both services. Tr. 242, 359-60. That is exactly what Midco did by installing ATC Trunks.

The court finds that Midco did not breach its state and federal tariffs in billing switched-access services. Because Midco's network used ATC trunk groups to connect Verizon and Midco's networks, the Sioux Falls Switch performed both end-office and tandem switching. The tariffs allowed Midco to charge for the services it actually performed. But if Midco had properly installed the DEOTs, it would not have the capability to provide tandem switching or tandem-mileage services. The court cannot allow for Midco to charge Verizon for services Verizon and Midco contracted to circumvent. Although Midco did not violate the terms of its state and federal tariffs, which permitted Midco to bill for services it provided, Midco did breach the Agreement when it charged Verizon for tandem switching and tandem-mileage services because the installation of the DEOTs was intended to prevent these charges.

### c. Verizon's Claim Arising from Disconnecting the Trunks

Verizon alleges Midco breached the Agreement by disconnecting the direct trunks. Docket 41 ¶¶ 26, 32. The Agreement permitted either party to terminate the Agreement for a "material breach" upon 30-days notice. Joint Ex. 8. A material breach occurs if the breach threatens to "defeat the very object of the contract." *Thunderstik Lodge, Inc. v. Reuer*, 585 N.W.2d 819, 824 (S.D. 1998) (internal quotation omitted). "Whether a party's conduct constitutes a material breach of contract is a question of fact." *Icehouse, Inc. v. Geissler*, 636 N.W.2d 459, 465 (S.D. 2001).

Midco alleges Verizon materially breached the Agreement by withholding payments not in good faith. Docket 40 ¶¶ 17-20. Section 8.1 of the Agreement states: "[Verizon] may initiate good faith disputes regarding billing and withhold payment up to six (6) months of its receipt of an invoice." Joint Ex. 8. Nothing in the Agreement required Verizon to notify Midco of the dispute or provide a written dispute prior to withholding payment. Verizon used the gap in time to adequately prepare its dispute by auditing, researching, and approving the dispute calculations. Once Verizon finished its audit, it notified Midco of its dispute in January. Prior to filing the formal dispute, Verizon withheld payment on the disputed tandem charges and the undisputed switch-access charges for October, November, and December invoices. This withholding delay was contemplated by the parties and is evident in the Agreement.

The court finds Verizon's dispute to have been made in good faith. Verizon conducted research and reviewed invoices, the LERG, and the tariffs. Verizon also cited an FCC order. Verizon's dispute was made with "honesty in fact" and thus good faith. Because Verizon did not materially breach the contract, Midco was not permitted to terminate the Agreement—i.e. disconnect the trunks. The court finds for Verizon on its breach of contract counterclaim related to Midco impermissibly disconnecting the trunks, thereby violating the Agreement.

## 2. Midco's Breach of Contract Claims

In Midco's first cause of action against Verizon, Midco alleges Verizon materially breached the Agreement by withholding amounts validly billed under

the Agreement and by prospectively seeking to withhold payment from Midco for validly owed and not yet billed services. Docket 40 ¶ 20. Midco alleges that Verizon breached the contract by withholding payments not in good faith. *Id.* But as stated above, Verizon initiated the dispute and withheld the payments in good faith and in accordance with the Agreement. There is no breach of the Agreement by Verizon. Because there was no breach by Verizon, the court finds in favor of Verizon on Midco's first cause of action.

### B. Midco's Declaratory Judgment Claim

Midco alleges that it is entitled to declaratory judgment relief under SDCL § 21-24-2 as it relates to the interpretation and enforcement of the Agreement and Midco's state and federal tariffs. Docket 40 ¶ 22. Under South Dakota law, courts have the "power to declare rights, status, and other legal relations[.]" SDCL § 21-24-1. "[S]uch declaration shall have the force and effect of a final judgment or decree." *Id.* SDCL § 21-24-2 allows corporations to seek declaratory judgments. Midco seeks a declaratory judgment that (1) Midco is entitled to be paid under the parties' Agreement, (2) Verizon has improperly withheld from Midco amounts lawfully billed to Verizon, and (3) Verizon may not in the future withhold amounts lawfully billed to Verizon by Midco. Docket 40 at 6.

The Agreement requires Verizon to pay Midco for end-office switching only. Midco is not entitled to be paid for tandem switching services because the Agreement specified the use of DEOTs to connect Verizon's network with Midco's network via a direct interface into the Sioux Falls Switch's Class 5

software. The Sioux Falls Switch would only provide end-office switching with this direct connection. Midco's breach of the Agreement by installing ATC trunks, instead of DEOTs, does not allow Midco to be entitled to tandem-charges. Under the Agreement, the court finds that Midco is entitled to be paid only for end-office switching as stated in the Agreement.

For Midco's second declaratory judgment request, the Agreement allowed Verizon to "initiate good faith disputes regarding billing and withhold payment up to six (6) months of its receipt of an invoice." Joint Ex. 8. The court previously found that Midco impermissibly charged Verizon for tandem-charges in violation of the Agreement. Additionally, the court found that Verizon's dispute and withholding were in good faith. Thus, the court finds that Midco is not entitled to a declaratory judgment in its favor on this issue.

For Midco's third declaratory judgment request, the Agreement allows Verizon to withhold payments up to six months after its receipt of an invoice. Joint Ex. 8. The court cannot take away Verizon's right to withhold payments when the contract granted Verizon that right. Thus, the court finds that Midco is not entitled to a declaratory judgment in its favor on this issue.

## III.    Compensatory Damages

Verizon seeks $1,301,355.27 in compensatory damages. Ex. 114; Ex. 115. Verizon alleges that it was injured and incurred damages from Midco's breach of the Agreement, including the amount Verizon overpaid Midco and the expenses Verizon acquired from Midco's disconnection of the trunks. Docket 41 ¶¶ 27, 33. In South Dakota, the measure of damages resulting from a breach

of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." SDCL § 21-2-1. "[T]he ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed[.]" *Ducheneaux v. Miller*, 488 N.W.2d 902, 915 (S.D. 1992). The court found that Midco breached the contract by (1) installing the wrong trunks and (2) disconnecting the trunks. Thus, Verizon is entitled to compensatory damages resulting from Midco's breaches of the Agreement.

### A. Tandem Charges Damages

#### 1. Disputed Charges

Verizon alleges that it suffered $928,618.51 in damages caused by Midco's breach of the Agreement by installing the wrong trunk group and charging for services the Agreement intended to avoid. Ex. 114; Ex.115. The Agreement obligated Midco to install "direct end office trunks." Joint Ex. 8. At trial, Verizon presented evidence that the installation of DEOTs would have permitted Midco to provide and, therefore, charge for end-office switching only. Tr. 191, 238. Midco presented evidence, however, that it installed ATC trunks and provided end-office and tandem switching services, along with tandem-mileage services. Tr. 227. Because Midco failed to comply with the Agreement, Verizon alleges that Midco billed Verizon for tandem switching and tandem-mileage charges, both services the Agreement intended to circumvent. Ex. 114. Thus, to put Verizon in the position it would have been in had Midco performed

under the Agreement, Verizon is entitled to damages for the invalid tandem switching and tandem-mileage charges.

Verizon alleges that Midco invalidly billed $174,495.24 in tandem-mileage charges. Ex. 11; Ex. 114. Verizon claims it is entitled to damages for these disputed charges on invoices dated on or after May 24, 2014. Docket 87 at 25. Midco agrees that such claims are timely. Docket 86 at 25. Thus, Verizon's claims for interstate tandem-mileage are timely as to the invoices date on and after May 24, 2014.

For the disputed tandem switching amount, Verizon alleges Midco invalidly billed $754,123.27 in tandem switching charges. Ex. 114. Verizon disputed intrastate invoices dated May 2011 and interstate invoices dated February 2014. The parties disagree about the timeliness of the tandem switching claims. The court previously held that Verizon's intrastate tandem switching claims were timely for invoices dated on or after April 30, 2011. Docket 58 at 19. Verizon's alleged damages for intrastate invoices start May of 2011 (Docket 87 at 25; Tr. 503-04), and therefore, are timely.

For Verizon's interstate tandem switching claims, the court's prior order denying summary judgment held that the statute of limitations and the parties' release barred Verizon's claims before invoices dated on or after May 24, 2014. Docket 58 at 15. Verizon argues that its claims can extend back to invoices dated on or after January 20, 2014. Docket 87 at 25. Verizon bases its argument on a two-year extension under 47 U.S.C. § 415(c):

> "For recovery of overcharges action at law shall be begun . . . against carriers within two years from the time the cause of action accrues

. . . except that if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim . . . ."

47 U.S.C. § 415(c).

Verizon alleges that it is entitled to this two-year extension from the statute because it sent notice to Midco about the disputed tandem switching charges on January 20, 2016. Docket 87 at 25; Joint Ex. 11. Thus, the two-year extension would allow Verizon to recover damages on invoices dated on or after January 20, 2014. But the statute does not extend the two-year period from the date of the claimant's notice. *See* 47 U.S.C. § 415(c). Instead, the statute states that "said period shall be extended to include two years from the time notice in writing is given by the *carrier* to the claimant of the disallowance of the claim." *Id.* (emphasis added). Here, Midco is the carrier and Verizon is the claimant. Thus, the two-year extension is from the date Midco notified Verizon that it was not accepting Verizon's dispute. On March 16, 2016, Midco informed Verizon that it believed it was providing the proper services and rejected Verizon's dispute. Ex. 28. Therefore, Verizon's claims can extend to invoices dated on or after March 16, 2014.

Because Verizon included the February and March 2018 invoices in its tandem switching dispute amount, the court cannot rely on the calculations summarized in Exhibit 114. Instead, the court used Exhibit 114 and Joint Exhibit 11 to determine the proper dispute amount for tandem switching. The court deducted the tandem switching dispute amounts from February and

March 2014 from the cumulative tandem switching dispute amount. For February, Verizon improperly included $14,171.05 for tandem switching charges in its dispute amount. For March, Verizon improperly included $12,961.09 for tandem switching charges in its dispute amount.

Thus, the court finds that Midco billed Verizon $726,991.13 in invalid tandem switching charges and $174,495.24 in invalid tandem-mileage charges. The total dispute amount is $901,486.37.

### 2. Deductions

Verizon disputed these tandem switching and tandem-mileage charges and began to deduct the disputed amounts from invoices for services Midco provided Verizon. Tr. 486. Verizon withheld $701,201.62 for disputed charges from Midco's invoices. Ex. 114 at 2; Tr. 504. In addition to this withheld amount, Verizon withheld $7,011.78 on non-disputed invoices. Ex. 114 at 2; Tr. 505. In totality, Verizon recouped $708,213.40. Ex. 114 at 2; Tr. 505. In computing Verizon's damages, these deductions are subtracted from the $901,486.37 dispute amount. *See* Ex. 114 at 2; Tr. 505. The amount of invalid tandem switching and tandem-mileage charges that Midco billed and Verizon disputed but has not been deducted is $193,272.97. Tr. 505.

### 3. Interest

Section 9 of the Agreement set the interest rate on withheld amounts to 1.5% per month. Joint Ex. 8; Tr. 507. Because the dispute was resolved in favor of Verizon, the Agreement requires Midco to pay 1.5% per month on the withheld amount. Verizon provided evidence that the total amount of interest

due on the paid disputes was $424,535.16. Ex. 114 at 2; Tr. 507-08. Verizon's alleged interest was based on the incorrect dispute amount as discussed above. Excluding the invoices from February and March of 2014, the court finds that the total amount of interest due on the paid disputes at the time of trial was $410,597.36.

Additional interest has accrued since the trial. Ms. Morgan testified that she believed the interest for the paid dispute amount would continue to accrue at the rate of $3,411.25 per month. Tr. 508. The monthly interest rate remains static because Verizon elected to not recover a varied interest for the ease of calculating damages. *Id.* This calculated amount is incorrect because it included the February and March 2014 invoices. The proper interest rate is $3,004.27. The interest amount for the last ten months is $30,042.70.

Similarly, Verizon owes Midco 1.5% interest on the non-dispute deductions Verizon made. At the time of trial, Verizon owed Midco $3,023.70 in interest for the additional non-disputed deductions by Verizon. Ex. 114 at 2. Interest continued to accrue since trial, and Verizon owes Midco an additional $1,051.80 in interest on these non-disputed deductions. Ex. 114 at 4. The net interest, including the interest during the trial and the court's consideration, is $436,564.56.

Therefore, the court awards Verizon $629,837.53 in compensatory damages for Midco's breach of the Agreement by installing the wrong trunks and improperly charging for tandem switching and tandem-mileage services.

### 4. Additional Alleged Damages

Verizon alleges that Midco's failure to install DEOTs entitles Verizon to an additional $275,500 in damages to cover the 58 months that Verizon paid Midco for "direct end office trunks" at a rate of $4,750 per month. Docket 87 at 19. Based on South Dakota law for compensatory damages, Verizon is entitled to damages that would put it in the position it would have been if the contract had been performed. If Midco had properly installed DEOTs, Verizon was obligated to pay the monthly rent for the DEOTs. Thus, Verizon is not entitled to these additional damages.

### B. DEOT Related Damages

### 1. DEOT Related Expenses

Verizon alleges that it suffered $628,737.45 in damages caused by Midco's disconnection of the DEOTs in violation of the Agreement. Ex. 115. Verizon presented Exhibit 115 to represent the damages that Verizon sustained as a direct result of Midco's disconnection of the DEOTs. Tr. 509-10. The period covered by Exhibit 115 begins with the disconnection of the DEOTs in March of 2016 and ends at the July 2018 invoice. Tr. 513. Verizon elected to stop collecting damages beyond the July 2018 invoices. *Id.*

Midco's disconnection of the DEOTs in March of 2016 imposed costs on Verizon. Tr. 509. Because of Midco's disconnection of the DEOTs, Verizon installed twelve new trunks. Tr. 513-14. The one-time installation charge for the trunks totaled $12,355.88. Ex. 115; Tr. 513-15. Verizon would not have

incurred these installation charges had Midco not disconnected the DEOTs because traffic would have continued to travel over the DEOTs. Tr. 515.

Verizon also suffered $22,354.17 in damages from the monthly service charges billed by CenturyLink for the use of the circuits. Ex. 115; Tr. 516. Additionally, Verizon had to pay $50,438.84 for port charges. Ex. 115; Tr. 518. Port charges are charges assessed by CenturyLink and other carriers on circuits that carried switched traffic. Tr. 518. Verizon would not have ordered these ports had the DEOTs remained in place. Tr. 519, 521, 523.

After the disconnection, instead of sending calls over the DEOTs, Verizon's calls flowed through the CenturyLink Tandem. Tr. 523. CenturyLink billed Verizon $346,109.83 for tandem switching and muxing charges (per-minute tandem charges). Ex. 115; Tr. 523-24. Verizon would not have incurred these charges had the DEOTs remained connected because traffic would have continued to flow across the DEOTs. Tr. 529. Verizon also paid $80,083.25 in tandem facility mileage charges that Midco billed after the disconnection through the July 2018 invoice. Ex. 115; Tr. 531. Additionally, Verizon incurred domestic optimal call routing (DOCR) charges because traffic could not flow over the DEOTs, and thus Verizon used DOCR carriers to terminate traffic to Midco. Tr. 534. Since the July 2018 invoice, Verizon has paid $199,803.00 in DOCR charges. Ex. 115; Tr. 534-35.

In totality, Verizon experienced $711,144.97 in DEOT-related expenses. Ex. 115; Tr. 537.

### 2. Avoided Charges

With the disconnection of the DEOTs, Verizon avoided several expenses it would have incurred if the DEOTs remained connected: DEOT monthly rent and end-office charges. Ex. 115. Prior to the disconnection, Verizon paid Midco $4,750 for the use of the DEOTs. Joint Ex. 8; Tr. 537-38. With the disconnection of the DEOTs, Verizon no longer paid Midco the $4,750 monthly payment. Tr. 537-38. Between the July 2018 invoice and July 2019, Verizon avoided $128,250.00 in DEOT charges. Ex. 115; Tr. 538.

Additionally, before the disconnection, Midco billed Verizon for end-office services because calls traveled over the DEOTs. Tr. 539. After the disconnection, Verizon's calls traveled via DOCR routes where the DOCR carriers terminated the calls to Midco. Tr. 538. Then, Midco billed the DOCR carrier, not Verizon, for end-office switching. *Id.* Thus, by sending the traffic over the DOCR route, Verizon avoided $34,494.27 in end-office charges. Tr. 539; Ex. 115.

Overall, Verizon avoided $162,744.27 in DEOT/end-office charges. Ex. 115. This amount is deducted from Verizon's damages.

### 3. Interest

In its computation of damages, Verizon included prejudgment interest. Ex. 115. "Any person who is entitled to recover damages . . . is entitled to recover interest thereon from the day that loss or damage occurred[.]" SDCL § 21-1-13.1. The prejudgment interest amount is either set by the contract or by South Dakota statute. *Id.* Here, the Agreement only set the interest rate for

withheld amounts. *See* Joint Ex. 8. South Dakota law sets the applicable interest rate at 10% per year. SDCL § 54-3-16(2). Prejudgment interest applies only to the DEOT-related damages and totals $80,366.76. Ex. 115; Tr. 541.

Thus, the court awards Verizon $628,737.46 in compensatory damages for Midco's breach of the Agreement by disconnecting the trunks. Ex. 115; Tr. 543.

### C. Attorney's Fees

Verizon alleges that it is entitled to attorney's fees under 47 U.S.C. § 206 if it prevailed on its tandem-charge counterclaims. Docket 87 at 25. A carrier is liable "for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter" and attorney's fees if the carrier did "any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . ." 47 U.S.C. § 206. The court found that Midco breached the Agreement, but it did not breach federal tariffs. None of Midco's actions are prohibited under the chapter or unlawful. Thus, Verizon is not entitled to attorney's fees under the statute.

### D. Total Compensatory Damages

Based on the evidence presented at trial and the court's calculations, Verizon proved it suffered $629,837.53 in damages for Midco's breach of the Agreement by installing the wrong trunks and charging for tandem switching and tandem-mileage services. Additionally, Verizon proved it suffered $628,737.46 in damages from Midco's disconnection of the DEOTs. Therefore,

the court awards $1,258,574.99 to Verizon for compensatory damages.

## CONCLUSION

Verizon and Midco's Agreement was initially breached by Midco when Midco installed ATC trunk groups instead of the DEOTs as required by the Agreement. For approximately the next nine years, Midco provided end-office switching services, which the Agreement intended Midco to provide, and tandem switching services, which were not included under the Agreement. Midco's charging for tandem switching services violated the Agreement. When Verizon became aware of the excess charging, Verizon exercised its rights under the Agreement to initiate a good faith dispute and withhold payments on its invoices for switched-access services. After Verizon formally notified Midco that Verizon was disputing and continuing to withhold payment of the invoices, Midco disconnected the trunks and terminated the Agreement in violation of the Agreement's termination clause. Midco failed to prove that Verizon's withholding constituted a material breach to allow Midco to terminate the Agreement. Verizon also established that it is entitled to a compensatory damages award of $1,258,574.99. Thus, it is

ORDERED that judgment will be entered in favor of defendant, MCI Communications Services, d/b/a Verizon Business, and against plaintiff, Midcontinent Communications, in accordance with this memorandum opinion and order.

IT IS FURTHER ORDERED that Midco is entitled to a declaratory judgment that it is entitled to be paid only for end-office switching under the Switched Access Service Agreement as interpreted by this court.

DATED July 2, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE